720 So.2d 817 (1998)
Donald R. LEGER, Plaintiff-Appellant,
v.
YOUNG BROADCASTING, INC., Defendant-Appellee.
No. 98-572.
Court of Appeal of Louisiana, Third Circuit.
October 28, 1998.
*818 Robert M. Becnel, LaPlace, for Donald R. Leger.
Pierre Marie Legrand, Metairie, for Young Broadcasting, Inc.
Before YELVERTON, THIBODEAUX and SAUNDERS, JJ.
SAUNDERS, Judge.
Plaintiff, Donald Leger, appeals a judgment of the Office of Workers' Compensation Administration (OWC) denying him entitlement to supplemental earnings benefits (SEB). We find that the plaintiff was entitled to such benefits as he was incapable of earning 90% of his pre-injury average monthly wage, and accordingly, we reverse. Furthermore, we award penalties and attorney's fees due to the employer's refusal to pay SEB.

FACTS
On January 17, 1996, Donald Leger, an employee of Young Broadcasting, Inc., sustained an injury to his lower back while lifting a camera and tripod during the course and scope of his employment. Mr. Leger was initially treated by Dr. Larriviere, an orthopedic surgeon, but was later referred to Dr. James McDaniel for surgery after discovery of a herniated disc at L5-S1. Dr. McDaniel performed a lumbar laminectomy and discectomy. On October 14,1996, Dr. McDaniel indicated that the claimant had reached "maximum medical healing" and could return to a moderate type of work activity.
Due to his injury, Mr. Leger was unable to return to his pre-injury occupation as a videographer earning an average weekly wage *819 of $425.98, which is comparable to a preinjury average annual wage of $21,981.00.
On his own initiative, Mr. Leger applied for several positions with different companies around the area. He received a job working as a substitute teacher for the Lafayette Parish School Board. Between February and March 1997, Mr. Leger earned a total of $1,185.25 in this position.
In addition, Mr. Leger applied for a position as a job coach at the Lafayette Association for Retarded Citizens, Inc. (LARC). On February 24, 1997, Mr. Leger commenced work there at an hourly rate of $6.87. Originally, this was to be a full-time position, but due to administrative problems, he was only allowed to work on a part-time basis until July 1, 1997. At that time, his hours were increased from 30 hours per week to that of a full-time employee of 40 hours per week. Mr. Leger continues to be employed by LARC and through May 25, 1997, his gross earnings were as follows:

Two Week Pay Period Gross Pay
2/17/97-3/2/97 $130.53
3/3/97-3/16/97 $336.63
3/17/97-3/30/97 $391.59
3/31/97-4/13/97 $498.08
4/14/97-4/27/97 $439.68
4/28/97-5/11/97 $422.51
5/12/97-5/25/97 $549.60

Subsequently, Mr. Leger began working full-time and earned the following gross wages from the LARC:

Two Week Pay Period Gross Pay
5/26/97-6/8/97 $549.60
6/9/97-6/22/97 $549.60
6/23/97-7/6/97 $555.20
7/7/97-7/20/97 $604.56
7/21/97-8/3/97 $610.40
8/4/97-8/17/97 $610.40
8/18/97-8/31/97 $610.40
9/1/97-9/14/97 $610.40
9/15/97-9/28/97 $610.40
9/28/97-10/12/97 $610.40

Thus, as of July, 1997, when he began fulltime employment, Mr. Leger grossed only $305.20 weekly, which amount is less than 90% of his pre-injury average weekly wage rate.
Only 3 checks were received in 1997 for SEB benefits totaling $2,259.62. The second check dated June 3, 1997, made out for $2,000.00, indicates on its face that "SEBS RESUMED," however, since that time only one other check was received. This check was dated June 16, 1997, and was for $47.62. Since that date, no further SEB payments have been made.
On June 2,1997, Federal Insurance Co., on behalf of Young Broadcasting, Inc., submitted a Notice of Payment, Modification, Suspension, or Supplemental Earnings Benefits (SEB) Entitlement to the Office of Workers' Compensation. The Notice stated that they were "resuming SEBS due to clmt still having wage loss." However, supplemental earnings benefits were never paid for any time period subsequent to May 29, 1997, despite the fact that claimant continued to provide the insurer with monthly earnings reports.
Three Labor Market Surveys, conducted by William Stampley, a licensed rehabilitation counselor retained by Young Broadcasting, Inc., identified several jobs allegedly paying in excess of 90% of Mr. Leger's preinjury average weekly wage. The first of these surveys sent to Mr. Leger by letter dated October 25, 1996, identified ten jobs which, according to Mr. Stampley, required only a light physical demand strength rating. However, the descriptions did not include the name of the employer, telephone number or contact person, thereby placing the burden on Mr. Leger to call Mr. Stampley in order to determine whom to contact. Furthermore, Mr. Stampley did not personally contact each of the potential employers regarding job openings, physical requirements, etc., but, instead, a member of his staff provided him with the information.
Dr. McDaniel refused to approve a managerial position at Circle K, specifically indicating that Mr. Leger was physically incapable of performing the work, despite Mr. Stampley's assertion that the job required only a light physical demand strength rating. Nevertheless, in Mr. Stampley's November 14, 1996 letter to Mr. Leger, he lists all ten positions, including the managerial position at Circle K, which was specifically disapproved by Dr. McDaniel.
By letter dated December 13, 1996, Mr. Leger reported to Mr. Stampley regarding *820 his progress in seeking employment. With respect to the jobs submitted by Mr. Stampley, Mr. Leger reported that he had called to apply for six of the ten potential positions but was either informed that the position had already been filled, that he failed the physical, or he never received any call back from the employer.
The second survey was provided to Mr. Leger on January 6,1997. Again, the name of the potential employer, the telephone number or name of the contact person was not provided. Mr. Stampley did not submit this job analysis to Dr. McDaniel for approval, but instead substituted his own judgment as to whether or not Mr. Leger was physically capable of performing the jobs.
The third survey, dated October 13, 1997, was conducted at the behest of defendant's attorney. This survey was not presented to Dr. McDaniel for approval, nor was it presented to Mr. Leger.
Trial was held, and on January 26, 1998, judgment was rendered in favor of Young Broadcasting, Inc. dismissing the claims of Donald Leger at his cost. This appeal followed.

Supplemental Earnings Benefits
Supplemental earnings benefits are awarded when a work-related injury prevents the claimant from earning ninety percent of his pre-injury wages. La.R.S. 23:1221(3). The amount of SEB is based upon the difference between the claimant's pre-injury average monthly wage and the claimant's proven post-injury monthly earning capacity. Banks v. Industrial Roofing & Sheet Metal Works, Inc., 96-2840 (La.7/1/97); 696 So.2d 551; La.R.S. 23:1221(3)(a).
Once the claimant has met this initial burden of proving entitlement to SEB, the burden of proof shifts to the employer if it wishes to prove the employee is earning less than he or she is able to earn. The employer bears the burden of proving that the employee is physically able to perform a certain job and that the job was offered to the employee or that the job was available to the employee in the employee's or the employer's community or reasonable geographic region. Daigle v. Sherwin-Williams Co., 545 So.2d 1005 (La.1989).
In Banks, 696 So.2d at 557, the Louisiana Supreme Court concluded that an employer may discharge its burden of proving job availability by establishing, at a minimum, the following by competent evidence:
(1) the existence of a suitable job within claimant's physical capabilities and within claimant's or the employer's community or reasonable geographic region;
(2) the amount of wages that an employee with claimant's experience and training can be expected to earn in that job; and
(3) an actual position available for that particular job at the time that the claimant received notification of the job's existence.
The Court went on to define "suitable job" as one that "claimant is not only physically capable of performing, but one that also falls within the limits of claimant's age, experience, and education, unless, of course, the employer or potential employer is willing to provide any additional necessary training or education." Id. at 557. If the employer satisfies its burden of showing that the supplemental earnings benefits' claimant was physically capable of work and that work was offered or available, claimant must show, by clear and convincing evidence unaided by any presumption of disability, that he is unable to perform employment offered or available solely as a consequence of substantial pain. Lubom v. L.J. Earnest, Inc., 579 So.2d 1174 (La.App. 2 Cir.1991).
Whether an employee has proved that he is unable to earn wages equal to ninety percent or more of the wages he earned before the accident is necessarily a fact and circumstance determination in which the court is mindful of the jurisprudential tenet that workers' compensation law is to be liberally construed in favor of coverage. Smith v. Louisiana Dept. of Corrections, 93-1305 (La.2/28/94); 633 So.2d 129. Furthermore, our appellate review of such a determination is governed by the manifest error standard. Id.
*821 We find that the workers' compensation judge was manifestly erroneous in determining that claimant was not entitled to supplemental earnings benefits. It is undisputed in the instant case, that Mr. Leger is unable to return to his pre-injury employment as a videographer. Since his injury he has been unable to earn 90% of his pre-injury earnings, and thus has met his initial burden of proving entitlement to SEB.
Young Broadcasting, Inc. has failed to prove that Mr. Leger is physically able to perform a certain job and that any such job was offered or available to him within a reasonable geographic region. As this court has previously held, earning capacity cannot be proven by an employer or insurer by only producing doctor-approved labor market surveys. See Pinkins v. Cardinal Wholesale Supply, Inc., 619 So.2d 52 (La.1993); Banks, 696 So.2d 551. The fact that Young Broadcasting, Inc. presented the workers' compensation judge with three labor market surveys (only one which was doctor approved) is insufficient to show that Mr. Leger's earning capacity is equal to at least ninety percent of his pre-injury wages.
As indicated above, Mr. Leger's pre-injury average weekly wage was $425.98, which computes to an average annual wage of $21,980.57. In order to avoid payment of supplemental earnings benefits, the defendant must show that there are jobs available that pay in excess of $19,782.51.
In Britton v. City of Natchitoches, 97-1038 (La.App. 3 Cir. 2/11/98); 707 So.2d 142, 146-147, this court explained the dilemma of "sham rehabilitation":
Unfortunately, the problem that this defendant and other employers and/or insurers have created is the practice of using vocational rehabilitation consultants for a purpose completely unintended by the workers' compensation statute. They are using vocational rehabilitation consultants to provide nothing more than "sham rehabilitation" to injured employees, while simultaneously using them to assist in defeating an injured workers' claim. See Maxie v. Brown Indus., Inc., 95-19 (La. App. 3 Cir. 5/31/95); 657 So.2d 443, writ denied, 95-1630 (La.10/6/95); 661 So.2d 469. In this case, "sham rehabilitation" was used to establish earning capacity, which, as stated earlier, is necessary in efforts to defeat or reduce a claim for SEB.
....
The primary goal of vocational rehabilitation is to return a disabled worker to work efficiently and expediently with minimum retraining. La.R.S. 23:1226; see also Maxie, 657 So.2d 443 and Livings v. Langston Cos., Inc./Continental Bag Div., 96-636 (La.App. 3 Cir. 12/5/96); 685 So.2d 405. The Louisiana Rehabilitation Counselor Licensing Act states that the client-counselor relationship is one in which the counselor assists in defining vocational goals and designing an action plan based upon the client's interests, abilities, aptitudes, and needs. La.R.S. 37:3443(3)(a). "A thorough rehabilitation counselor will consult medical records, treating physicians, and, just as importantly, the client/injured employee. In addition, appropriate forms of skills and achievement tests should be utilized." Livings, 685 So.2d at 413. Consequently, vocational rehabilitation plays a crucial role in ascertaining entitlement to SEB and the amount to be paid to a claimant, because the vocational rehabilitation consultant is in a strategic position to determine the post-injury earning capacity of an injured claimant. Unfortunately, because employers are required to provide rehabilitation services to injured employees who are unable to earn wages equal to those earned before being injured, there has developed a use of vocational rehabilitation that is completely adverse to that described above. The vocational rehabilitation consultant is not undertaking his duties to assist in determining a realistic appraisal of access to employment. See Pinkins, 619 So.2d 52. Instead this type of "vocational rehabilitation" is "no more than a cruel diversion from the reality of the goals it ought to advance. Regrettably, the use of vocational rehabilitation `experts' has become a forensic tool on behalf of employers who use it to betray the salutary principles and obfuscate the ameliorative *822 objectives of our workers' compensation laws." Maxie, 657 So.2d at 448.
In the case before us, we find an overwhelming amount of evidence indicative of sham rehabilitation. Two of the surveys relied upon by the defendant were never submitted for physician approval, and the first survey was only submitted for approval after it had already been given to the claimant. Despite Dr. McDaniel's disapproval of the position at Circle K, this position appeared as a potential job in a subsequent letter to Mr. Leger and also in the third labor market survey.
Of the nine jobs which were physician-approved, only two of the jobs even arguably exceeded an average annual salary of $19,782.51. The first of these was a position for Admissions Representative at Southern Technical College. When Mr. Leger contacted Southern Technical, he was informed that the position had already been filled. Thus, it clearly was not available.
The second position was for an Account Representative/Sales Associate at Metropolitan Life Insurance, and the survey with regards to this job stated as follows:
Account Representative/Sales AssociateA multi-line insurance company accepting applications for openings for accounts representative/ sales associate. This is a full-time position with a light physical demands strength rating. The physical demands include the ability to frequently sit; occasionally stand and walk; no stooping, crouching, or climbing; and maximum lifting of less than twenty pounds. Representatives will sell various multi-line insurance policies and securities, and they will handle investments. A 13-week formal training program is provided for all new employees to prepare them for taking the licensing test. During this training period employees are paid. It was reported that sales associates have "high earning potential," but the employer would not discuss a specific salary. The Louisiana Wage and Industry Survey, 1996, reports that these employees earn an average medium wage of $12.10 per hour in Lafayette. (emphasis ours)
While the median salary of $12.10 per hour, or $24,000 per year, would exceed the requirements, this salary is indicative of a median salary of all insurance sales people, not the entry-level position listed in the survey. There is no evidence demonstrating what the actual starting annual salary is for an employee with no prior experience or training. The amount of wages that Mr. Leger could earn in that job has not been demonstrated by competent evidence, and thus the employer has not met its burden. The remaining seven jobs listed in the first labor market survey did not provide salaries in excess of 90% of Mr. Leger's pre-injury average weekly wage and therefore do not merit discussion.
Several problems exist with the second survey. The survey was never submitted for physician review or approval. Since it is uncertain whether any of the jobs listed in the second survey were within Mr. Leger's physical capabilities, the first prong of Banks is unsatisfied. Young Broadcasting, Inc. has failed to carry its burden of showing that a job is available that is within the claimant's physical limitations.
Moreover, of the five jobs included in the survey, only three demonstrated the potential for Mr. Leger to earn in excess of 90% of his pre-injury average weekly wage. Two positions in the second survey were in the field of insurance and are as follows:
Insurance SalesAn insurance company in Lafayette, Louisiana is advertising and accepting applications for insurance sales. This is a full-time position with a sedentary physical demands strength rating. The physical demands include the ability to frequently sit, although standing may be altered as needed; occasional walking; no stooping, crouching, or climbing; and maximum lifting of less than ten pounds. Salesman will work "in the field" selling insurance and other services which the company provides. No experience is needed, as comprehensive training is provided. This employer will aid all personnel in becoming licensed. In order to obtain a license, a 2-day course must be taken and you must pass a state test. This company does offer financial assistance during the *823 licensing process. Once licensed, salesmen will participate in comprehensive training, provided by the company, in order to learn about specific services and products, in addition to sales technique. During the first year of employment, salesmen average $20,000-$25,000.
Insurance SalesThis is a full-time position with a sedentary physical demands strength rating. The physical demands include the ability to frequently sit; occasionally stand and walk; no stooping, crouching, or climbing; and maximum lifting of less than ten pounds. This employee will handle sales and service of traditional life and health insurance policies, in addition to providing consumer financial services. The company provides all sales leads, and the work is done "in the field". No experience is necessary to apply, as formal on-the-job training is provided. The entry-level salary for this position is $430.00 per week.
With respect to the first insurance sales positions, the employee must pass a state licensing exam. The insurance company does not offer an employee a regular salary or commission until after such license is obtained. Further, Mr. Stampley stated that the salary given in the survey was only an average as information on starting salaries for insurance salesman could not be obtained because they were based on commissions earned.
Additionally, with regard to the insurance positions, Glenn Hebert, who was accepted as an expert in the field of vocational rehabilitation, testified that the turnover in the insurance industry is very high. He also stated that if an employee in insurance sales did not make commissions equal to their weekly salary, they would be terminated. Mr. Hebert advised that it was not economically feasible for Mr. Leger to leave the job that he was in now to look for a new one. Again, the employer has failed to meet another criteria set forth in Banks as it cannot show the amount of wages that an employee with claimant's experience and training can be expected to earn as an insurance sales person.
The third potential position in the survey that met the wage requirements stated as follows:
Manager TraineeA car rental agency is accepting applications for several openings. This is a full-time position (50-52 hours per week) with a light physical demands strength rating. The physical demands include the ability to alternate sitting and standing; occasional stooping and bending; no climbing, and lifting less than twenty pounds. Manager Trainees may sometimes be required to wash cars. This employer prefers applicants with a college degree. The entry-level salary for a Manager Trainee is $22,500.
Enterprise Rent-A-Car was the potential employer. Kevin Kaiser, who was identified as the contact person, testified that he had no authority to either interview or hire applicants. He also testified that he was unaware of any jobs available at Enterprise on the date of the survey. Again, Young Broadcasting, Inc. has failed to meet its burden since it is unable to prove that an actual position existed for Mr. Leger at the time of the survey.
The third labor market survey was sent only to counsel for Young Broadcasting, Inc. This survey was not sent to Dr. McDaniel for physician approval, nor was it sent to Mr. Leger for him to conduct a search, making it clear that this survey was conducted solely to enhance the defendant's position for purposes of this litigation.
Thus, we find that Young Broadcasting, Inc. failed to meet the burden imposed upon it to avoid payment of SEB.

Attorney's Fees & Penalties
Pursuant to La.R.S. 23:1201 and 23:1201.2, an insurer who arbitrarily and capriciously fails to pay compensation claims may be liable for penalties and attorney's fees. La.R.S. 23:1201(F) provides, in part, as follows:
F. Failure to provide payment in accordance with this Section shall result in the assessment of a penalty in an amount equal to twelve percent of any unpaid compensation or medical benefits or fifty dollars per calendar day, whichever is greater, *824 for each day in which any and all compensation or medical benefits remain unpaid, together with reasonable attorney fees for each disputed claim; however, the fifty dollars per calendar day penalty shall not exceed a maximum of two thousand dollars in the aggregate for any claim....
La.R.S. 23:1201.2 allows for the imposition of reasonable attorney's fees incurred in the prosecution and collection of a workers' compensation claim when the employer arbitrarily, capriciously and without probable cause fails to pay a claim or discontinues payment of claims due and arising under the chapter. Whether the employer's act is arbitrary, capricious or without probable cause depends upon the facts existing and known to the employer at the time its decision as to benefits was made. Bynum v. Good News Const., 96-41 (La.App. 5 Cir. 5/28/96); 675 So.2d 1203, writ denied, 96-1693 (La.10/4/96); 679 So.2d 1388.
In reviewing the award for statutory penalties in this matter, we recognize that a workers' compensation judge is given great discretion in determining that penalties are due. Miller v. Byles Welding & Tractor Co., 96-164 (La.App. 3 Cir. 6/5/96); 676 So.2d 665. This discretion is not to be overturned unless it is clearly wrong. Id.
In this matter, the workers' compensation judge failed to award either penalties or attorney's fees. Because we find that the employer's conduct amounts to no more than sham rehabilitation, we hold that Young Broadcasting Services, Inc. acted arbitrarily and capriciously in its termination of supplemental earnings benefits, and thus an award of both penalties and attorney's fees is appropriate.
In order to obtain vital and elemental information about the jobs listed in the survey, Mr. Leger was required to take time off from his job that he had found for himself to contact the rehabilitation counselor. Fifteen potential jobs were presented by the two surveys. Of the fifteen, the employer could not show that any of them met the wage requirements and some were not even submitted for physician approval, and others simply did not exist.
Our review of the record convinces us that the employer has made no effort to screen out inappropriate leads for this employee, but rather has chosen to present him with a "laundry list" of potential employers who may or may not have jobs available, which may or may not be within the employee's capabilities, and which may or may not pay more than 90% of his pre-employment wages. The employer did not even bother to provide the employee with such basic information as the names, addresses and phone numbers of the contact person, but rather left it to the employee to seek out this information on his own. The end result was that the employee had to leave work on repeated occasions to ferret out leads which repeatedly proved futile. It is not hard to imagine that this multitude of dead end leads would have caused great hardship and extensive frustration to an employee who was attempting to regain his compromised earning capacity. The employees of this state deserve better than the cavalier attitude demonstrated by the employer in the present case.
In accordance with La. R.S. 23:1201, penalties shall be calculated at fifty dollars per calendar day. Because the last payment was made on June 16, 1997, the maximum of two thousand dollars ($2,000.00) in penalties shall be awarded. We also find that an award of two thousand five hundred dollars ($2,500.00) in attorney's fees to be reasonable.

DECREE
For the foregoing reasons, the judgment of the workers' compensation court is reversed and rendered in favor of plaintiff-appellant for supplemental earnings benefits. Defendant-appellee is hereby ordered to pay two thousand five hundred dollars ($2,500.00) in attorney's fees and the maximum amount of penalties, two-thousand dollars ($2,000.00), are also assessed. Defendant is to be assessed all costs of these proceedings.
REVERSED AND RENDERED
YELVERTON, J., concurs and assigns reasons.
*825 YELVERTON, Judge, concurring.
I agree that the employer failed to carry its shifted burden of proving job availability in accordance with the minimum standards of proof required by Banks, 696 So.2d 551, and that an award of both penalties and attorney's fees is appropriate. The workers' compensation judge recognized five specific "problems with the vocational work" calling them "deficiencies." While I have no hesitation in joining the finding of an award of penalties and attorney's fees, I stop short of condemning the vocational work as a "sham rehabilitation."