|,YELVERTON, J.
Julia Hess appeals a workers’ compensation judgment which found that she was not entitled to supplemental earnings benefits. For the following reasons, we affirm.
FACTS
Hess, who was trained in respite and as a cook, went to work for Grand Casino Coushatta in December 1994, as a lead line cook/supervisor. On August 18, 1996, she was injured while working. She fell backward over a stool while she was backing out of the walk-in cooler with her arms full of hamburger meat. She injured her lower back, left hip, and left leg.
Hess first sought medical treatment with Dr. Randy Lamartiniere on August 23, 1996. Dr. Lamartiniere, an internal medicine doctor, had previously treated Hess for mild diabetic neuropathy. This condition affects the nerves in a person’s arms or legs and can cause a numbness and tingling sensation. Dr. Lamartiniere remarked that her neuropathy had not changed much, but it had gotten better before her accident. He observed that her symptoms were different and more severe after the fall.
On September 27, Hess called Dr. La-martiniere’s office complaining that her *603 “back and legs were killing her” and that she could not do her work. Dr. Lamartini-ere prescribed pain medication and provided a work excuse. This was the first time that Hess was unable to work since the accident, missing work for the first time on October 7. Hess began receiving temporary total disability benefits at this time. Dr. Lamartiniere referred her to Dr. Lawrence Drerup, a neurosurgeon. Dr. Drer-up saw Hess on October 2, 1996. He observed that the accident had exacerbated her symptoms of neuropathy. He scheduled her for nerve conduction studies and x-rays of her lumbar spine. She later also had a lumbar myelogram and a post-myelographic LOT, which evidenced no structural pathology to account .for her symptoms. Dr. Drerup then referred Hess to a neurologist, Dr. Elke Werner.
The neurologist observed that Hess suffered decreased sensation to the left leg and thigh. Dr. Werner suspected that this was the result of a stretch injury to the sciatic and femoral nerves on the left side, a possible lumbosacral plexopath, which is a stretch injury slightly more proximal in the course of the nerves, and that the stretch injury was superimposed upon an underlying diabetic polyneuropathy.
Dr. Werner referred Hess to Dr. Stephen Katz, an anesthesiologist with an interest in pain, for chronic pain management. Dr. Katz started Hess on a conservative course of therapy to treat her pain which he found resulted from a glu-teus medius muscle strain and SI joint dysfunction relating to her fall at work. He also administered trigger point injections. Dr. Katz opined that the fall exacerbated the pain which she suffered secondary to polyneuropathy resulting from her diabetes. Dr. Katz released Hess to light-duty work on April 8, 1997.
Hess returned to work for Grand Casino on April 15, 1997, as a card sorter in the card room. As a result of her employment, Hess’s benefits were reduced to supplemental earnings benefits (SEB).
Hess was evaluated by Dr. Charles Tex-ada on April 15, 1997. He diagnosed her as suffering with bursitis along with SI joint problems. He continued to evaluate her, and, on August 12 and 14, 1997, Hess was administered a functional capacity evaluation. Dr. Texada reviewed the evaluation and determined that she was able to perform sedentary to light-duty activity. Dr. Texada continued to see her. His progress notes indicate that she was not experiencing relief from her pain.
The workers’ compensation carrier asked that Dr. Texada report on Hess’s work status as of February 5, 1998. On March 24, 1998, Dr. Texada evaluated and found that there was nothing he could do for her and released her from his care. He Lalso signed a work status report which indicated ,she was unable to return to work. Dr. Texada referred her back to Dr. Drerup. As of February 5,1998, Hess was removed from her job, and temporary total benefits were resumed.
Dr. Drerup saw her on March 25, 1998. When he was asked to reevaluate her, he had not seen Hess for two years. He discharged her on July 6, 1998, at which time he felt she was capable of returning to gainful employment at sedentary, light, or borderline medium duty.
Grand Casino once again offered a light-duty position to Hess as a hostess in Roxie’s, one of its restaurants. She started work on July 30, 1998. Hess worked at Roxie’s for about a week when she left work. Grand Casino did not resume benefits, and Hess filed the present claim.
SUPPLEMENTAL EARNINGS BENEFITS
The trial court recognized that Hess was limited to light-duty work but *604 further found that she failed to demonstrate that because of substantial pain, she was incapable of performing the job offered by the employer which paid her greater than her pre-injury wages. It denied her claim for SEB finding that she voluntarily left a job where she was earning slightly more than she did before the accident. Hess claims that this finding was in error.
“The purpose of SEBs is to compensate the injured -employee for the wage earning capacity he has lost as a result of his accident.” An employee is entitled to receive supplemental earnings benefits (SEBs) if he sustains a work-related injury that results in his inability to earn ninety percent (90%) or more of his average pre-injury wage. Initially, the employee bears the burden of proving, by a preponderance of the evidence, that the injury resulted in his inability to earn that amount under the facts and circumstances of the individual case. “Th[is] analysis is necessarily a facts and circumstances one in which the court is mindful of the jurisprudential tenet that workers’ compensation is to be liberally construed in favor of coverage.”
l4Once the employee’s burden is met, the burden shifts to the employer who, in order to defeat the employee’s claim for SEBs or establish the employee’s earning capacity, must prove, by a preponderance of the evidence, that the employee is physically able to perform a certain job and that the job was offered to the employee or that the job was available to the employee in his or the employer’s community or reasonable geographic region. Actual job placement is not required. The amount of SEBs is based upon the difference between the claimant’s pre-injury average monthly wage and the claimant’s proven post-injury monthly earning capacity.
Banks v. Industrial Roofing & Sheet Metal Works, Inc., 96-2840, pp. 8-9 (La.7/1/97), 696 So.2d 561, 556 (citations omitted)(alteration in original).
We first consider Hess’s argument that the trial court erred in finding that a previous heart condition and diabetic neuropa-thy problems had reduced her to light-duty work. A review of the trial court’s oral reasons for judgment indicates that in reviewing the evidence introduced at trial, the trial court commented that, “So we can see that Ms. Hess in 1994 was limited to light duty because she had coronary artery disease.” The court further recognized that, “Before her injury she was limited to light duty because of her coronary artery disease.” In discussing her present condition the trial court stated that, “After the job accident she was limited to light duty because — allegedly because of the restrictions placed upon her from the stretch injury to her nerves.”
It is apparent that the trial court recognized the fact that Hess had pre-existing conditions which had limited her ability before her accident, but that the accident was what caused her present light-duty disability status. Therefore, we find no merit to these arguments.
Addressing the trial court’s finding regarding Hess’s entitlement to SEB, we must examine whether the trial court was correct in finding that Hess was capable of performing the hostess position offered by Grand Casino. Hess argues that due to substantial pain she could not perform the job as hostess.
| .¡Regarding SEB, Louisiana Revised Statute 23:1221(3)(e)(ii) provides that “if the employee establishes by clear and convincing evidence, unaided by any presumption of disability, that solely as a consequence of substantial pain, the employee cannot perform employment offered, ten *605 dered, or otherwise proven to be available to him, the employee shall be deemed incapable of performing such employment.” Furthermore, if the employer satisfies its burden of proving that the employee was physically capable of work and that work was offered, the employee must establish by clear and convincing evidence, unaided by any presumption of disability, that he is unable to perform employment offered or available solely as a consequence of substantial pain. Leger v. Young Broadcasting, Inc., 98-572 (La.App. 3 Cir. 10/28/98), 720 So.2d 817, writ denied, 98-2953 (La.2/5/99), 738 So.2d 1 (citing Lubom v. L.J. Earnest, Inc., 579 So.2d 1174 (La.App. 2 Cir.1991)).
“Moreover, it is well settled that a determination of whether a claimant’s pain is substantial enough to be disabling is a question of fact that must be determined according to the circumstances of each individual case.” Gamer v. Sheats & Frazier, 95-39, p. 6 (La.App. 3 Cir. 7/5/95), 663 So.2d 57, 61. “[T]he manifest error standard of appellate review applies in worker’s compensation eases and great deference is accorded to the hearing officer’s factual findings and reasonable evaluations of credibility.” Id.
The trial court in its oral reasons for judgment, reviewed the testimony offered by the parties concerning the circumstances surrounding Hess’s employment as a hostess. Finding that it correctly sets forth the facts as established by the record, we quote from the oral reasons:
Ms. Hess testified that when she returned to work at Roxie’s as a hostess that she was not permitted to have the breaks, that she was required to bus tables, lifting bussing tubs that — that weighed in excess of forty pounds, as she described, full of dishes.. This testimony was contradicted by the employees of the Grand Casino.
|fiMs. Christina Sammartino was the new supervisor for Roxie’s restaurant. She remembered Ms. Hess clearly because Ms. Hess was the first employee under her supervision who had returned to work with workers’ compensation restrictions. She remembered that she was making every effort to comply with the restrictions placed upon Ms. Hess.
She contradicted Ms. Hess’ testimony that Ms. Hess was required to bus tables. She said that the shift' that Ms. Hess was working at Roxie’s restaurant, most of the food was served in — in baskets and that these baskets didn’t have much weight to them anyway. She said that there were other persons on staff to bus the tables.
She there Was a chair provided for Ms. Hess to sit down when she needed and that Ms. Hess was, in fact,, afforded breaks. Ms. Hess testified that she did take thirty minute breaks on some of the days she worked at the casino. Ms. Sammartino testified she overheard Ms. Hess speaking to other employees that she did not like working the graveyard shift. Ms. Hess left work, did not return, did not state to Ms. Sammartino that she was having problems doing the job. This testimony was corroborated by Doc — by Darrel Metoyer who was the general manager for Roxie’s restaurant.
Ms. Hess testified at trial that after leave- — after working briefly as a hostess at Roxie’s restaurant she began working at an establishment -known as Lebo’s which is apparently a convenience store....
She first testified that it was six to seven months after she left working at Roxie’s before she began working at Lebo’s. However, the records reflect later, per her testimony, that she actually began working at Lebo’s in October of *606 '98, less than three months after she stopped working at Roxie’s.
Her job at Lebo’s was cooking, waiting on customers, performing general duties of a cashier/cook. She said that was a part-time job but she did work on occasion forty hours a week.
During Hess’s course of medical treatment, Dr. Drerup referred her to Dr. Phillip Osborne in early 1998. After taking her history, examining her, and performing a residual functional capacity test, Dr. Osborne concluded that:
[S]he was not showing any cardiovascular evidence of significant pain input. Unfortunately, I believe that this patient has a disease of life. She is aging, and I think that she does have some input from the diabetic neuropathy and diabetes. There is so much psychosocial overlay not that she is just dysfunctional. None of the testing on the functional capacity supports the patient’s complaints. The only thing that can be said about the functional capacity is that she ought to be able to do sedentary, light and borderline medium work based on the Dictionary \7of Occupational Titles. This is a gross under-estimation of what she could do if she was motivated. Unfortunately, I think that at this time that this is primarily a psychosocial problem and a patient with a disease of life.
A complete reading of the trial court’s reasons for judgment indicate that the trial court had problems with Hess’s credibility on several issues. Adding the trial court’s impression to the fact that the medical evidence indicates Hess’s complaints were subjective and that the doctors were of the opinion that she could perform light-duty work, we find that the trial court was not manifestly erroneous in denying Hess SEB. There was sufficient evidence to support the court’s determination that Hess failed to prove she had to work in substantial pain.
The judgment of the trial court is affirmed. Costs of this appeal are assessed to Julia Hess.
AFFIRMED.